IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
February 13, 2001 Session

## STATE OF TENNESSEE v. DANYELLE DEWAIN PARKER

**Appeal from the Criminal Court for Davidson County**
**No. 98-D-3077      Steve Dozier, Judge**

_____

**No. M2000-00405-CCA-R3-CD  - Filed April 26, 2001**

_____

The defendant was convicted by a Davidson County Criminal Court jury of aggravated burglary, aggravated assault, and kidnapping, for which he received an effective sentence of eighteen years. In this appeal as of right, he raises the following issues: 1) whether the trial court erred in allowing the victim's son to testify about the defendant's prior assault on the victim; 2) whether the convictions for aggravated assault and kidnapping should have been merged; and 3) whether the trial court erred in imposing consecutive sentencing. Based upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ROBERT W. WEDEMEYER, J., joined.

James O. Martin, III, Nashville, Tennessee, for the appellant, Danyelle Dewain Parker.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Rachelle A. Laisnez, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Danyelle Dewain Parker, was indicted by the Davidson County Grand Jury for aggravated burglary, aggravated assault in violation of a court order of protection, reckless endangerment, aggravated assault by use or display of a dangerous weapon, and aggravated kidnapping. Following a jury trial, he was convicted of aggravated burglary, aggravated assault in violation of a court order of protection, and kidnapping. The trial court sentenced him as a Range II, multiple offender to eight years on the aggravated burglary conviction, ten years on the aggravated assault conviction, and six years on the kidnapping conviction, with the aggravated assault and aggravated burglary sentences to be served consecutively, for an effective sentence of eighteen years.

Following the denial of his motion for a new trial, the defendant timely appealed to this court, presenting the following issues for our review:

I. Whether the trial court erred in allowing the victim's young son to testify regarding the defendant's prior assault of the victim;

II. Whether the convictions for aggravated assault and kidnapping should have been merged; and

III. Whether the trial court erred in imposing consecutive sentencing.

Based on our review, we affirm the convictions and the sentence imposed.

## FACTS

The events giving rise to the defendant's convictions occurred on August 3, 1998, at the Nashville apartment of the victim, Sheila Johnson. The victim is the mother of the defendant's son, Ferris Parker, who was approximately twenty months old in August 1998. Although the defendant and the victim had had a romantic relationship, lasting approximately eight years and surviving several of the defendant's terms of incarceration, the victim had ended the relationship several months prior to August 1998. By August 3, 1998, relations between the two had severely deteriorated, and the victim had an order of protection in place against the defendant.

The victim explained at trial that she had been prompted to seek the order of protection by the defendant's June 30, 1998, assault upon her during a barbecue at his mother's house. Although no longer romantically involved with the defendant at the time, she had gone to the barbecue because she wanted Ferris to know his father. She said that she had agreed to go to an upstairs bedroom with the defendant so that they could discuss their son in privacy. In the bedroom, however, the defendant changed the subject, pressuring her for sex. When he refused to take no for an answer, or to let her leave the room, the victim called for the defendant's mother, who managed to wrest the victim from the defendant's grasp.

Back downstairs, the victim sat on a couch in the living room with the defendant's mother and her boyfriend, the defendant's brother's girlfriend, and the victim's older son, Marquez Johnson, who was then nine years old. Staring at the victim from another couch in the room sat the defendant, who, after "mumbling" and "grinding his teeth," suddenly got up and struck her in the mouth with his closed fist. When the victim got up, the defendant struck her twice more in the face with his fist. The third blow knocked her off her feet and over a coffee table. She went outside, where the defendant continued to hit her, striking her with his fist four times on her face and torso. Subsequently, on July 7, 1998, the victim obtained an order of protection against the defendant.

At trial, the victim's account of the June assault was corroborated by the testimony of her older son, Marquez Johnson, who stated that after watching the defendant hit his mother three times in the living room, he followed her outside, where he saw the defendant hit her several more times in the jaw with his fist.

The victim testified that on the evening of August 3, 1998, the defendant telephoned her at her home. She told him that she did not want to talk and hung up. When he kept calling, she activated the "call block" feature on her telephone to avoid receiving any more calls from the defendant and went to bed. It was approximately 11:00 p.m. At 11:30 p.m., the defendant appeared outside her apartment, loudly banging on her front door and demanding that she let him inside. Refusing her commands to go away, he continued to beat and kick at the door until he had broken through a dead bolt lock, a chain lock, and a chair that she had propped against the door and gained entry to her apartment.

The victim stated that she was terrified, and "just stood there" in shock while the defendant cursed at her. Ferris began to cry, and she went to get him. When she returned with the baby, she found that the defendant had armed himself with a knife from her kitchen. He ordered her to sit in a chair. By the victim's account, she sat with Ferris in her arms for approximately thirty to forty minutes while the defendant, holding the knife, cursed her and told her that he was not going to allow her to be with any other man. For a time, the defendant held the knife against her neck, telling her that he was "going to cut [her] damn throat right now." The defendant threw the knife down, and it hit the table and broke in half. She said that he went to the kitchen and retrieved a larger knife, but that he put it back when his cousin, Sharon Allen, came to the door of the apartment.

The victim testified that the defendant first allowed Allen, and then Rita Montgomery, a neighbor, inside the apartment. However, he continued his "ranting and raving," telling the women that the victim was "not going no damn where." As Allen attempted to calm the defendant, the victim moved to a couch in the living room. Montgomery sat beside her, and surreptitiously asked her if she wanted her to call the police. The victim nodded yes. Montgomery left the apartment, to return in a few minutes to repeat the same whispered question. The victim again indicated that she wanted the police, and Montgomery once more left the apartment.

The victim testified that in spite of the defendant's threat that he would kill her if she let the police in, she opened the door of the apartment when police officers arrived. The defendant ran to her older son's bedroom, and she gestured to the police officers, indicating which direction he had fled. The officers took her and Ferris out of the apartment, and arrested the defendant. The victim did not know what had happened to the knife that the defendant had held against her throat. She had assumed that the officers had recovered it from the apartment.

On cross-examination, the victim testified that the entire episode lasted about two hours. She admitted that while Allen was attempting to calm the defendant, she had swept up pieces of splintered wood from the broken door frame, and that she had made no attempt to leave the apartment. She said, however, that she did not believe that the defendant would have allowed her

to leave if she had tried, stating that he was acting as "door monitor," "controlling" the entire area of the apartment around the front door.

Sandra Easley, who lived in an apartment across from the victim, testified that as she was preparing to enter her apartment sometime after 11:30 p.m. but before midnight on August 3, 1998, she heard the victim screaming, "No, Dewan, no, Dewan," and saw wood particles on the ground beside the victim's front door. Easley said that she immediately went across the street to Sharon Allen's home to tell her what was happening. As Allen entered the victim's apartment, Easley went to the home of Rita Montgomery, a friend of the victim, to inform her of the situation. She and Montgomery then went to the victim's apartment together, knocked on the door, and were admitted by the defendant.

Easley testified that when she got inside, she saw the victim sitting on the couch with her baby, looking scared. She described the victim as "crying and shaking, nervous." She and Montgomery sat beside her, and asked if she wanted the police. She indicated that she did, and Easley and Montgomery left the apartment. However, because people in their neighborhood were generally reluctant to call the police, she and Montgomery went back to the victim's apartment to ask again if she really wanted the police to be called. After the victim nodded yes, Easley and Montgomery went to Easley's apartment, where Montgomery called 911.

Easley testified that both times they entered the victim's apartment, the victim appeared to be scared. She said that the defendant was standing "like a door monitor" at the door as they came in and out, but that he "was calm" and "wasn't doing nothing" but "just standing there."

On cross-examination, Easley admitted that the defendant had not tried to prevent her from entering or leaving the apartment, and that she had never heard him say that the victim could not leave. She stated, however, that she had not been focused on what the defendant was doing or saying, because she was concentrating her attention on the victim. She said that she had not seen a weapon anywhere in the apartment.

Rita Montgomery testified that she had seen chips of wood and a cracked door frame when she approached the front door of the victim's apartment. She knocked, and the defendant admitted her. The victim was seated on the couch, holding the baby and crying. Montgomery approached her and, in a whisper, asked what the victim wanted her to do. The victim whispered back that she wanted the police. Montgomery asked if she was sure, the victim said yes, and Montgomery left the apartment. However, because they did not trust the police in their neighborhood, Montgomery went back to the victim's apartment a second time to make sure that the victim truly wanted the police to be called. The defendant again admitted her, and she again approached the victim and questioned her in a whisper whether she wanted the police. The victim whispered "yes," and Montgomery left to call 911. When asked why she had felt it necessary to whisper her questions to the victim, Montgomery explained that it was because of the tense "atmosphere" that she felt when she entered the apartment. However, Montgomery admitted on cross-examination that the defendant had

allowed her to enter and exit the apartment, that she had not seen him do anything, and that she had not seen a knife.

Officer William Stokes of the Metropolitan Nashville Police Department testified that he had responded to a report of a domestic disturbance at the victim's apartment. The victim, who answered the door, verbally told him that she was all right, and that no one else was in the apartment. At the same time, however, she appeared to be "agitated and nervous," and almost immediately motioned with her hands, pointing "back in towards the apartment." Stokes said that he interpreted her gesture to mean "[t]hat somebody was in there that she was afraid of, that was causing her to be scared." Stokes got the victim and her baby out and walked to the side of the apartment, where he saw someone coming out of a side window. When he yelled to other officers that someone was coming out a window, the person retreated back into the apartment. After several minutes of calling for him to come out, the defendant emerged from the apartment and was arrested. Officer Stokes admitted on cross-examination that he had not seen a knife in the apartment.

Without revealing his relationship with the defendant, Ed Castle, the defendant's probation officer, testified that, prior to August 3, 1998, he had twice discussed the order of protection with the defendant. He said that he had explained how orders of protection work, and told the defendant that he should "go out of his way to not have any contact with [the victim]."

Following the trial court's denial of the defendant's motion for judgment of acquittal, Sharon Allen, the defendant's cousin, took the stand to testify in the defendant's behalf. She stated that on the evening of August 3, 1998, she had been informed that she was needed at the victim's apartment. When she arrived, she found the defendant in the apartment with the victim and her baby. She learned that he had been there for approximately twenty to thirty minutes, and that "[s]omething had been going on." Allen said that she was able to calm things down, and that she stayed in the apartment until the police arrived. She had not seen a knife during the time that she was in the apartment.

On cross-examination, Allen could not remember who had told her that she was needed at the victim's apartment. She could remember, however, that the situation had been conveyed to her as urgent, and that she had been informed that she "needed to go right then." Allen testified that the victim's door appeared as if "[s]omebody forced their way in," and that the victim had appeared to be "scared." Allen stated that she placed herself between the victim and the defendant and attempted to get the defendant to leave the apartment with her, but he refused, insisting that he had done nothing wrong. Allen admitted that the entire time that she was in the apartment, she had been trying to keep things calmed down, because she "wanted to make sure nothing wasn't going to jump off."

The defendant testified that he and the victim had been in a "love relationship" for approximately nine years. He had been in jail for drug convictions five times during that period. He and the victim had been able to maintain their relationship during all but his last jail term, when the relationship somehow "just took a whole ninety [sic] degree turn." During that jail term, which

lasted about eleven months, the victim would "only talk for a little while," when he called her, and he was able to tell that there was "no spark there."

The defendant said that he had attempted to rekindle the relationship upon his release from jail, because he loved the victim. Things did not work out, however, and it made him feel "helpless" and "depressed." On the evening of August 3, 1998, he had been at home watching televison with his mother and her boyfriend. When his mother and her boyfriend began to get "all lovie dovie," it made him feel lonely and "down and out." He telephoned the victim, because he wanted someone to be "lovie dovie" with and "wanted things to be good." He knew that the order of protection meant that he was not supposed to call the victim. He claimed, however, that he and the victim had seen each other "five or six times" since the order of protection was issued.

The defendant testified that when he reached the victim by phone, she asked that he call her back. When he called back, he got no answer, and it made him depressed. He went to her apartment because he felt the need to talk to her. The victim refused to open the door, and he "found [himself] hitting against the door, knocking a little harder," and then "banging against the door with [his] shoulder." When the door gave way, he entered the apartment. The defendant said that he told the victim, whom he described as "in a frantic," to calm down, and that all he wanted was to talk. He did not threaten her at any time and never held a knife on her. He said that she had not made any attempts to leave the apartment while he was there, that he had not told her that she could not leave, and that he would not have prevented her from leaving, had she desired to do so.

On cross-examination, the defendant admitted that the order of protection prohibited him from any contact with the victim, and that the victim had told him "several times" when he was banging on her front door to go away. He admitted that he had shattered the door frame when he burst through the victim's locked door, making her "frantic." He denied, however, that he had been angry or had threatened the victim. He also denied that he had attempted to crawl out a side window when the police arrived, stating that he was merely looking out the window. He said that he came out when the police called him because he knew "it was the right thing to do."

After deliberations, the jury found the defendant guilty of aggravated burglary, aggravated assault in violation of a court order of protection, and kidnapping, and not guilty of reckless endangerment and aggravated assault based on the use or display of a dangerous weapon. The trial court sentenced him as a Range II, multiple offender to eight years on the aggravated burglary conviction, ten years on the aggravated assault conviction, and six years on the kidnapping conviction. Finding that the defendant had an extensive criminal history, that he was a dangerous offender whose behavior indicated little or no regard for human life, and that the offense had been committed while he was on probation, see Tenn. Code Ann. § 40-35-115(b)(2), (4), & (6) (1997), the trial court ordered that the aggravated burglary and aggravated assault sentences be served consecutively, for an effective sentence of eighteen years. Following the denial of his motion for a new trial, the defendant filed a timely appeal to this court.

## ANALYSIS

## I. Testimony of Prior Assault

The defendant first raises the issue of whether the trial court erred in allowing the victim's older son, Marquez Johnson, to testify regarding his June 30, 1998, assault against the victim. Noting that the victim had already testified to the events of June 30, the defendant contends that ten-year-old Marquez's tearful testimony was unnecessary cumulative evidence whose probative value was outweighed by the prejudicial effect it had upon the jury.

The State responds by arguing that the defendant waived any objection to the witness's testimony by his failure to object at trial, and by his failure to challenge on appeal the trial court's ruling that evidence of the defendant's prior bad acts was admissible. The State further argues that even if the defendant has not waived the issue, the witness's testimony regarding the defendant's June 30, 1998, assault was relevant to corroborate and lend credibility to the victim's testimony.

The admissibility of the witness's testimony of the June 30, 1998, assault, as a prior bad act of the defendant, is governed by Tennessee Rule of Evidence 404(b), which states:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Under this rule, evidence that a defendant has committed a crime or bad act other than that for which he is charged is generally inadmissible, even though the crime or act may be of the same character as that for which he is on trial. See State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993). However, if the evidence is found to be relevant to some matter actually in issue in the case, and its probative value is not outweighed by the danger of its prejudicial effect, it may be admitted. Id. The exceptions to the exclusionary rule of 404(b) are when evidence is offered to prove the defendant's motive, identity, or intent; the absence of mistake; opportunity; or that the crime was committed as

part of a common scheme or plan. See Bunch v. State, 605 S.W.2d 227, 229 (Tenn. 1980). When the trial court has substantially complied with the requirements of Rule 404(b), we review its decision for an abuse of discretion. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The record in this case reveals that, following the defendant's motion in *limine* to exclude testimony by the victim of the defendant's prior assaults against her, the trial court held a hearing outside the jury's presence at which the State offered proposed testimony by both the victim and her son regarding the June 30, 1998, assault. At the conclusion of this jury-out hearing, the court ruled the testimony admissible, finding that evidence of the assault was material to show the defendant's intent and motive in going to the victim's home, and that its probative value outweighed its prejudicial effect. Subsequently, without any further objections from the defendant, both the victim and her son repeated their testimony before the jury.

Our review reveals no abuse of discretion by the trial court in allowing the testimony. The defendant was indicted for one count of aggravated assault for "intentionally or knowingly caus[ing] or attempt[ing] to cause bodily injury or commit[ting] or attempt[ing] to commit an assault" against the victim after having been enjoined by a court from having any contact with her. See Tenn. Code Ann. § 39-13-102(c) (1997). We agree with the trial court that evidence of the defendant's June 30, 1998, assault upon the victim, which gave rise to the order of protection, was material to the issue of the defendant's motive and intent in going to the victim's apartment on the evening of August 3, 1998. Furthermore, we also agree with the State that the defendant waived any objection to the victim's son's testimony, on the grounds that it was unnecessarily cumulative and that its probative value was outweighed by the danger of unfair prejudice, by his failure to raise the issue at trial, thereby preventing the trial court an opportunity to rule on the matter before the witness began his testimony before the jury. See Tenn. R. App. P. 36(a); see also State v. Eldridge, 951 S.W.2d 775, 783-84 (Tenn. Crim. App. 1997) ("Ordinarily, the failure to take available action to prevent or nullify the alleged error waives the issue."). This issue, therefore, is without merit.

## II. Merging of Offenses

Next, the defendant contends that the trial court erred in failing to merge the kidnapping and aggravated assault convictions. He asserts that the detention of the victim was merely incidental to the aggravated assault, and, thus, the two convictions should be merged. The State disagrees, arguing that the facts clearly show that the defendant committed aggravated assault by breaking into the victim's apartment in violation of the court order, and the separate offense of kidnapping by forcing the victim to sit in the chair for thirty to forty minutes.

In State v. Anthony, 817 S.W.2d 299 (Tenn. 1991), our supreme court concluded that due process considerations prohibit a defendant from being convicted of kidnapping and an accompanying felony when the facts of the case indicate that the kidnapping was "essentially incidental" to the other felony. Id. at 307. The court acknowledged that Tennessee's broadly worded kidnapping statute, if not narrowly applied:

> could literally overrun several other crimes, notably robbery and rape, and in some circumstances assault, since detention and sometimes confinement, against the will of the victim, frequently accompany these crimes.

Id. at 303 (quoting People v. Levy, 15 N.Y.2d 159, 256 N.Y.S.2d 793, 204 N.E.2d 842, 844 (1965)). When considering the appropriateness of a kidnapping conviction, the question for a reviewing court is "whether the confinement, movement, or detention is essentially incidental to the accompanying felony and is not, therefore, sufficient to support a separate conviction for kidnapping, or whether it is sufficient enough, in and of itself, to warrant independent prosecution and is, therefore, sufficient to support a conviction." Id. at 306. In State v. Dixon, 957 S.W.2d 532, 535 (Tenn. 1997), our supreme court held that the primary focus is "the purpose of the removal or confinement and not the distance or duration." If the movement or confinement is found to be beyond that necessary to consummate the accompanying felony, then the next inquiry is "whether the additional movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm." Id. (citing Anthony, 817 S.W.2d at 306). When the purpose of the confinement or removal is not necessary to the commission of the accompanying felony, the kidnapping is not incidental to the accompanying felony. Id.

As support for his contention that the kidnapping conviction should be merged with the conviction for aggravated assault, the defendant applies the "merely incidental" or "merely preparatory" test set forth in State v. Barney, 986 S.W.2d 545 (Tenn. 1999),[1] rather than the "essentially incidental" test of Anthony and Dixon. The "merely incidental" test of Barney, however, does not apply in this case. Our supreme court adopted the test in Barney for use in cases involving multiple sexual offenses, based on a recognition that the essentially incidental test of Anthony, while useful to determine the appropriateness of a kidnapping conviction combined with an accompanying felony such as rape or assault, was "not helpful in the context of sexual offenses[.]" Id. at 548. Thus, the appropriate test in this case is the one articulated in Anthony and Dixon, in which the relevant inquiry is whether the kidnapping was essentially incidental to the aggravated assault, or whether sufficient facts exist to show that the kidnapping conviction could stand alone.

After considering the facts of this case in light of the principles and factors set forth in Anthony and Dixon, we conclude that the defendant's separate convictions for aggravated assault and kidnapping were proper. The defendant's conviction for aggravated assault was based on his violation of the following statute:

> A person commits aggravated assault who, after having been enjoined or restrained by an order, diversion, or probation agreement

---

[1]Under Barney, factors to be considered in determining whether two or more sexual acts may be the subject of separate convictions include the spatial and temporal proximity of the offenses, the occurrence of intervening events, the sequence of the acts, and the defendant's intent as evidenced by his conduct and statements. Id. at 548-49.

of a court of competent jurisdiction from in any way causing or attempting to cause bodily injury or in any way committing or attempting to commit an assault against an individual or individuals, intentionally or knowingly attempts to cause or causes bodily injury or commits or attempts to commit an assault against such individual or individuals.

Tenn. Code Ann.§ 39-13-102(c) (1997). Assault is defined, *inter alia*, as "[i]ntentionally or knowingly" causing another "to reasonably fear imminent bodily injury." See Tenn. Code Ann. § 39-13-101(a)(2) (1997). The proof in this case shows that the defendant, knowing that he was subject to a court order of protection, which the victim had been prompted to seek by his prior assault against her, went to the victim's house and broke through her locked door, sending her, in his own words, into "a frantic." These actions, alone, are sufficient to sustain his conviction of aggravated assault.

We agree with the State that the defendant's detention of the victim in her apartment after he had broken through her door constituted a confinement beyond that necessary to consummate the act of aggravated assault. The victim testified that the defendant held her at knifepoint in a chair for thirty or forty minutes, until his cousin arrived. She further testified that even after the arrival of the other women, the defendant continued to hold her in the apartment against her will, "ranting and raving" and telling her that he would not let her leave. Her testimony was corroborated by Sandra Easley, who said that the defendant was acting as "door monitor," and by Rita Montgomery, who described the atmosphere in the apartment as tense and testified that she had felt the need to whisper her questions to the victim in order to avoid the defendant's overhearing her.

The defendant's confinement of the victim in the chair before the other women arrived prevented her from summoning help, lessened his risk of detection, and increased the risk of harm to her. While alone in the apartment with the angry defendant, the victim was at much greater risk of harm than she was when others had joined her in the apartment. The defendant's cousin, Sharon Allen, admitted at trial that she could tell upon her entry into the apartment that "[s]omething had been going on." She felt it necessary to position herself between the defendant and the victim, and to stay in the apartment until police arrived, in order to make sure that the situation did not escalate.

After a thorough review, we, therefore, conclude that the kidnapping was not essentially incidental to the aggravated assault, and that the evidence supports the defendant's separate convictions for aggravated assault and kidnapping.

### III. Consecutive Sentencing

Finally, the defendant argues that the trial court erred in using consecutive sentencing to impose an effective sentence of eighteen years. Citing State v. Holt, 691 S.W.2d 520 (Tenn. 1984), he contends that consecutive sentencing was inappropriately applied in the case because the crimes for which he was convicted all arose out of the same incident and were related to one another. The

State disagrees, pointing out that if a trial court finds proof of the existence of one of several enumerated statutory factors by a preponderance of the evidence, it may, in its discretion, order consecutive sentencing regardless of whether the offenses arose out of the same or multiple proceedings. The State argues that the trial court appropriately imposed consecutive sentencing based on its findings that the defendant was a dangerous offender whose behavior indicated little or no regard for human life; that he had an extensive criminal history; and that the offenses were committed while he was on probation.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider: (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancing factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103 and -210; State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987).

The party challenging the sentences imposed by the trial court has the burden of establishing that the sentences are erroneous. Sentencing Commission Cmts. to Tenn. Code Ann. § 40-35-401; Ashby, 823 S.W.2d at 169. In this case, the defendant has the burden of illustrating the sentences imposed by the trial court are erroneous.

Tennessee Code Annotated Section 40-35-115 provides that the trial court may, in its discretion, impose consecutive sentencing on a defendant convicted of multiple offenses if it finds by a preponderance of the evidence that the defendant falls into any one of several different categories. Among these are the three that the trial court found applicable to the defendant in this case:

> (2) The defendant is an offender whose record of criminal activity is extensive;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(6) The defendant is sentenced for an offense committed while on probation[.]

Tenn. Code Ann. § 40-35-115(b)(2), (4), & (6) (1997). If the trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, however, it is required to make further findings that the defendant's sentence reasonably relates to the severity of his offenses, and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995). Since the trial court did not explicitly make those additional findings, we review this issue *de novo*, with no presumption of correctness given to the trial court's determinations.

As an initial matter, we reject the defendant's contention that his crimes were so closely related that consecutive sentencing could not be appropriately applied in his case. The case cited by the defendant, State v. Holt, 691 S.W.2d 520 (Tenn. 1984), does not, as the defendant implies, hold that consecutive sentencing is inappropriate any time that a defendant's multiple convictions result from actions that take place during a single episode. In Holt, our supreme court merely recognized that "in many instances" in which a defendant, based on the same facts, is convicted of both manufacturing marijuana and possessing it with the intent to sell, "concurrent sentencing may be appropriate." Under Tennessee Code Annotated Section 40-35-115 and case law, it is within a court's discretion to impose consecutive sentencing if the preponderance of the evidence shows that the defendant falls within one of the enumerated classifications, and all other appropriate standards are met.

Here, the defendant testified at trial that he had been incarcerated at least five different times for drug convictions. His presentence report shows numerous additional convictions, including assault, trespassing, DUI, and criminal impersonation. It is also clear from the record that the defendant was on probation, and, in fact, wearing an electronic monitor, at the time that he broke into the victim's home. Thus, the record fully supports the trial court's imposition of consecutive sentencing, based on findings that the defendant has an extensive criminal history and that he committed the offenses while on probation for another offense.

We also conclude that the record supports findings that the defendant met the statutory definition of a "dangerous offender," and that his extended sentence reasonably relates to the severity of his offense and is necessary to protect the public from further criminal harm by the defendant. As the trial court emphasized at sentencing, the defendant was subject to a court order of protection, based on his previous assault against the victim, at the time he committed these offenses. Evidence presented at trial showed that the defendant was aware of the order and understood its meaning. Nevertheless, he telephoned the victim at her home; went to her apartment when she refused to talk with him by phone; began banging and kicking at her door when she refused him entry and ordered

him to go away; forced his way into her apartment by shattering her front door frame, breaking through a dead bolt lock, a chain lock, and a chair that she had propped against the doorknob in her efforts to prevent his entry; cursed and threatened her when he was inside the apartment; and held her in the apartment against her will until police officers arrived at the scene. Under the circumstances, consecutive sentencing is warranted based on the defendant's classification as a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high.

## CONCLUSION

Based on the foregoing reasoning and conclusions, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE